# UNITED STATES DISTRICT COURT

# DISTRICT OF NEBRASKA

**Rodney Johnson,**
Plaintiff,

v.

**City of Omaha, Nebraska;**
Ryan Wiesen, in his individual capacity;
Bernard in den Bosch, in his individual capacity;
Jeffery Bloom, in his individual capacity;
Karen Taylor, in her individual capacity;
Hanna Adeponu, in her individual capacity;
Laura Marlane, in her individual capacity;
and John Does 1–5,
**Defendants.**

8:26cv187

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA
2026 MAY -1  AM 9: 49
OFFICE OF THE CLERK

# COMPLAINT

Plaintiff Rodney Johnson, proceeding pro se, alleges as follows:

## I. JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3. Venue is proper in this District under 28 U.S.C. § 1391 because all events giving rise to these claims occurred in Nebraska and all Defendants reside in Nebraska.

## II. PARTIES

4. Plaintiff Rodney Johnson is an individual residing at 6716 Northridge Drive, Omaha, Nebraska 68112.

5. Defendant City of Omaha is a municipal corporation organized under the laws of the State of Nebraska, with its principal offices located in Douglas County, Nebraska. At all relevant times, the City of Omaha acted through its departments, officers, employees, agents, and policymakers under color of state law.

6. Defendant Ryan Wiesen is an individual who, at all relevant times, served as a Deputy City Attorney for the City of Omaha. He is sued in her individual and official capacities.

7. Defendant Bernard in den Bosch is an individual who, at all relevant times, served as a Deputy City Attorney for the City of Omaha. He is sued in his individual and official capacities.

8. Defendant Jeff Bloom is an individual who, at all relevant times, served as an Assistant City Attorney for the City of Omaha. He is sued in his individual and official capacities.

9. Defendant Karen Taylor is an individual who, at all relevant times, served as an official within the City of Omaha Public Works Department. She is sued in her individual and official capacities.

10. Defendant Hanna Adeponu is an individual who, at all relevant times, served as an official within the City of Omaha Public Works Department. She is sued in her individual and official capacities.

11. Defendant Laura Marlane is an individual who, at all relevant times, served as an official within the Omaha Public Library Division. She is sued in her individual and official capacities.

12. Defendants DOES 1–10 are presently unknown individuals who participated in, authorized, directed, ratified, or knowingly acquiesced in the conduct alleged herein. Their true identities will be substituted upon discovery.

# III. FACTUAL ALLEGATIONS

## A. Plaintiff's Protected Activity

13. Plaintiff engaged in protected First Amendment activity, including:

- filing lawsuits against the City of Omaha;

- submitting public records requests;

- protesting City contract awards; and

- advocating for enforcement of the Small and Emerging Business (SEB) ordinance.

## B. Defendants Treated Plaintiff's Protected Activity as "Adverse"

14. Defendants treated Plaintiff Rodney Johnson's protected First Amendment activity as a negative factor in internal communications and decision-making.

15. Plaintiff's prior lawsuits, public records requests, and complaints against the City were referenced and circulated across multiple departments in connection with matters involving Plaintiff. In internal communications, Douglas County Purchasing and General services informed Adeponu to use caution when dealing with Johnson stating '[he] has contested bid awards previously so wanted to be a bit more careful in our communications to him.' (Ex. A, BJS-378A). This statement reflects that Plaintiff's protected activity was a known and operative factor in the City's internal decision-making and communication strategy.

16. Defendant Hannah R. Adeponu further used Plaintiff's protected activity as a factor in evaluating contract-related decisions, including bid review and award determinations. Stating , 'I believe this will protect our division and the City,' while directing that a specific, pre-drafted explanation be provided to Plaintiff regarding the bid outcome. (Ex. A, BJS-378A).

17. During a City Council meeting, Councilmember Brinker Harding publicly acknowledged that Plaintiff's litigation activities were the basis for restricting access to SEB-related information. Specifically, Harding stated: "There's been a determination by our legal team, the City of Omaha's Law Department, that discussion on this issue may impact or jeopardize a pending lawsuit." (Ex. B, BJS-322A). Consistent with this determination, the City Law Department directed multiple City departments to withhold SEB-related interpretation and discussion in matters involving Plaintiff. Harding further confirmed that departments were not responding to inquiries based on this directive, explaining that additional discussion could "jeopardize a pending lawsuit."

18. Councilmember Amy Melton stated: "You're a representative of the taxpayer, you're an attorney for the City of Omaha, and there's a pending lawsuit. Again, it's the City of Omaha. That is against the taxpayers of the City of Omaha." (Ex. H, BJS-321A).

19. This statement reflects a characterization of Plaintiff as a litigant positioned in opposition to the City, despite Plaintiff not being a party to the pending civil rights lawsuit referenced during the proceedings.

20. These actions were not based on performance or neutral criteria, but instead were tied to Plaintiff's exercise of constitutionally protected rights.

21. As a result, Defendants' conduct would deter a person of ordinary firmness from engaging in protected First Amendment activity.

22. These actions were not based on performance or neutral criteria, but instead were tied to Plaintiff's exercise of constitutionally protected rights. As a result, Defendants' conduct would deter a person of ordinary firmness from engaging in protected First Amendment activity, thereby constituting adverse action under the First Amendment. See, e.g., Santiago v. Blair; Peterson v. Kopp; Pendleton v. St. Louis County.

**C. Denial of Access to Administrative Remedies Through Law Department Interference with HRRD**

23. Under the Omaha City Charter, the Human Rights and Relations Department ("HRRD") —not the City Law Department—is expressly charged with the 'investigation, elimination and prevention of all forms of prohibited discrimination.' This statutory mandate establishes HRRD as the City's designated investigative body for discrimination complaints brought by private citizens. (Ex. C, BJS-05A)

24. In 2021, Former Director Franklin Thompson of HRRD declined to investigate Plaintiff's complaint, stating, 'Unfortunately, your case is beyond the purview of what my office investigates.'

25. Director Thompson explained that this limitation was based on direction from the Law Department, stating, 'I was specifically told by the Law Department that my office had no jurisdiction over this case...' This refusal occurred despite HRRD's oversight role in the SEB program and reflects the Law Department's involvement in restricting HRRD's investigative function in matters involving Plaintiff, contrary to its statutory mandate. (Ex.D BJS-165A)

26. Director Thompson directed Plaintiff to the City Law Department rather than conducting an independent review, stating, "For that you have to go directly to Planning and City Law to file your complaint and get answers (even if you don't plan on going to court)." This directive required Plaintiff to seek resolution through the very department implicated in the underlying conduct, rather than through HRRD's investigative process, effectively bypassing the City's designated mechanism for addressing discrimination complaints. (Ex. D, BJS-165A)

27. Following a private meeting with Plaintiff during which he was encouraged to walk away from BJ's existing custodial contract, Director Thompson stated that neither he nor his staff would engage in further communication with Plaintiff and directed him to route all

future concerns through the City's Law Department. He specifically instructed: "Please refer all future concerns to Ms. Michelle Peters in the City's Law Department." (Ex. E, BJS-189A). This directive effectively precluded Plaintiff from further access to HRRD's investigative processes and channels for addressing discrimination-related concerns.

28. In 2024, under the leadership of Defendant Cailin Daly Dejillas, Director of HRRD, the Department again refused to investigate Plaintiff's discrimination complaints arising from Public Works. Director Dejillas stated: "At this point, we need to agree to disagree that your request is within the Department's purview." (Ex. G, BJS-394A).

29. This refusal mirrors the prior conduct of HRRD under former leadership, including the use of substantially similar "purview" language to decline investigation, reflecting a continued and consistent pattern of denying Plaintiff access to HRRD's investigative processes.

30. Director Cailin Daly Dejillas also transferred investigatory responsibility to the City's Law Department, stating: "I have forwarded your concern to the Law Department." (Ex. H, BJS-410A). This response mirrors prior refusals and further demonstrates HRRD's ongoing practice of redirecting discrimination complaints away from its Charter-mandated investigative function and into the control of the Law Department.

31. Defendant City Attorney Ryan Wiesen restricted HRRD from providing Plaintiff with SEB ordinance clarification and guidance, invoking pending litigation as the basis for limiting communication and departmental response.

32. Ryan Wiesen, Deputy City Attorney. With respect to your specific question, again, the issues that Mr. Johnson raises are similar to issues that he has raised in a federal civil rights lawsuit challenging, again, another contract he has with the city." (Ex. H, BJS-321A)

33. During a City Council proceeding, Defendant Ryan Wiesen stated: "because this question could impact the current federal litigation that the City is defending, I'm going to advise the representatives of the Human Rights and Relations Department not to answer your question here today." This statement reflects direct intervention by the Law Department to prevent HRRD from responding to Plaintiff's inquiries. (Ex. H, BJS-321A)

34. Approximately forty-five days after publicly asserting that Rodney Johnson was a litigant in the civil rights case, Defendant City Attorney Ryan Wiesen acknowledged in written correspondence to BJ's Fleet Wash's counsel, Adam Sipple, that this characterization was false, stating that Johnson "is not a party to this case," thereby confirming that the earlier public statement was inconsistent with known facts. (Ex. K, BJS-335A)

35. No reasonable official in Defendant Ryan Wiesen's position—having previously secured Johnson's dismissal from the federal civil rights case he later invoked—could have reasonably believed it was lawful to represent that Johnson had a pending civil rights claim or to disseminate that assertion across City departments more than one year later. (Ex. J, BJS-291A).

36. Defendants' conduct reflects a municipal policy or custom of refusing to investigate discrimination complaints involving Plaintiff, despite a clear statutory mandate requiring such action. Under Meier v. City of St. Louis, a municipality is liable under 42 U.S.C. § 1983 where its policy or custom is the moving force behind a constitutional violation.

37. The City of Omaha's Human Rights and Relations Department is expressly required to investigate and address discrimination complaints. (See Ex. C, BJS-05A ). Defendants' refusal to do so—particularly where directed by the Law Department—constitutes a failure to perform a mandated governmental duty. Such conduct, when arbitrary or inconsistently applied, may give rise to constitutional violations. See Mills v. City of Grand Forks; Powell v. Noble; Creason v. City of Washington.

38. In addition, Defendants relied on knowingly false or misleading statements regarding Plaintiff's status to restrict access to information and limit administrative engagement. The use of knowingly false information in governmental decision-making may give rise to a due process violation where it affects outcomes or deprives an individual of protected rights. See Clark v. Abdallah; Yates v. State. Where such statements are used to influence decision-making processes and result in harm, they support a cognizable constitutional claim. See Torgerson v. Roberts County.

39. Taken together, Defendants' refusal to investigate, departure from statutory obligations, and reliance on knowingly false or misleading information establish a direct causal connection between municipal policy and the deprivation of Plaintiff's constitutional rights, supporting liability under 42 U.S.C. § 1983.

**D. Retaliatory Reinterpretation of the SEB Ordinance Resulting in Denial of Equal Participation in the Bidding Process**

40. Defendant Ryan Wiesen's pre-litigation communications reflect a clear understanding that SEB prioritization governs the evaluation and award phase of the procurement process. In advising City personnel, Wiesen stated: "You couldn't just award the bid to the non-SEB bidder because the SEB was substantially higher. You would first have to reject the SEB bid, providing the reasons for rejection and giving an opportunity to appeal the rejection to the City Council." (Ex. DD; BJS-220A)

41. Defendant Ryan Wiesen first introduced this reinterpretation of the SEB ordinance during the Brook Bench deposition on April 19, 2024, where he articulated a new position regarding the timing of SEB prioritization. Specifically, Wiesen stated: "This interpretation—that prioritization process happens prior to publication of solicitation, not after—I just want to make sure that that—" (Ex. I, BJS-355A Tr 22:21-22:6).

42. Defendant Cailin Daly Dejillas, through HRRD, adopted and communicated a restrictive interpretation of the SEB ordinance directly to Plaintiff. HRRD stated: "The determination to prioritize small or emerging small businesses and Tier I businesses happens ahead of soliciting bids, not after receiving bids." This interpretation was communicated exclusively to Plaintiff and not as part of any publicly issued guidance or uniformly applied standard. (Ex. FF; BJS-393A)

43. This interpretation was communicated exclusively to Plaintiff and was never formally ratified or adopted through any authorized legislative or administrative process, reflecting an ad hoc interpretation lacking official authority.

44. Judicial review of Defendants' asserted reinterpretation of the SEB ordinance during the custodial case further undermines its credibility. The court expressly characterized Defendants' position as dubious, stating: "They also dubiously assert their interpretation that § 10-200.3 only requires the city to prioritize Tier I ESBs 'prior to the publication of the solicitation, not after publication or during the selection/evaluation process.'" (Order at 4, Page ID #48615). (Ex. Y; BJS-421A)

45. When BJ's Fleet Wash was no longer participating in the SEB program, the City reverted to including the plain language of the SEB ordinance in its bid solicitations, rather than the restrictive interpretation previously communicated to Plaintiff. This shift supports a reasonable inference that the prior interpretation was selectively applied rather than uniformly enforced. " In the event that the City receives a bid from an SEB authorized bidder all non-SEB authorized bids shall be automatically rejected for failing to meet the SEB reserve requirements set forth in the bid specifications, and the SEB authorized bids received will be evaluated for possible contract award." (Ex. EE; BJS-471A)

## E. Defendants Retaliated Against Plaintiff Through His Business

46. The City's Public Works Department, through its Parking Division, issued a solicitation designated as a 100% SEB contract for power washing services. BJ's Fleet Wash submitted the lowest bid by a substantial margin. (Ex. GG; BJS-361A)

47. BJ's Fleet Wash submitted the lowest bid of approximately $18,900 to clean six parking garages, while Rolling Suds submitted a higher bid of approximately $59,950 for the same scope of work. Rather than awarding the full contract to the lowest bidder,

Defendants Hannah R. Adeponu and Karen Taylor split the award, allocating approximately $5,700 to BJ's Fleet Wash for three garages and $41,700 to Rolling Suds. (Ex. HH; BJS-366A)

48. Plaintiff Rodney Johnson, acting in his capacity as a resident taxpayer, submitted a formal bid protest challenging the City's award of a power washing contract for $41,700 to a Tier II contractor, despite BJ's Fleet Wash, a certified Tier I contractor, submitting a substantially lower bid of $5,700. In his protest, Plaintiff specifically challenged the City's compliance with the SEB ordinance and raised concerns regarding the fairness, transparency, and fiscal responsibility of the procurement process. (Ex. II; BJS-369A)

49. In response to Plaintiff's taxpayer protest, interdepartmental communications reflect that City personnel were cautioned in their interactions with BJ's Fleet Wash. Specifically, Defendant Hannah R. Adeponu was advised: "[he] has contested bid awards previously so wanted to be a bit more careful in our communications to him." (Ex. A, BJS-378A).

50. In response to this directive, the Department deviated from standard bid evaluation practices and instead structured its award decision to be more defensible in light of Plaintiff's prior challenges. Internal communications reflect that, rather than applying ordinary procurement criteria, City personnel coordinated with Purchasing, General Services, and the Law Department to adjust the award structure. Specifically, Defendant Hannah R. Adeponu proposed splitting the contract and redistributing work between bidders, stating: "I believe this will protect our division and the City and would like to move forward with it." (Ex. A, BJS-378A).

51. Internal communications reflect that Defendant Hannah R. Adeponu was in consultation with the Law Department regarding the structure of the award. In those communications, the Law Department questioned the rationale for dividing the contract in a manner that allocated the smaller, lower-value portions of the work to BJ's Fleet Wash, noting concerns that such a division "could be seen as targeting." (Ex. M, BJS-373A)

52. The Law Department further acknowledged that both riders were capable of doing the entire job without splitting it and stated "theoretically they all qualified to do the work," and questioned whether there was any legitimate basis to prevent a single vendor from performing the entire contract. (Ex. M, BJS-373A)

53. Internal communications reflect that Defendant Hannah R. Adeponu referred the proposed award structure to the Law Department, where Deputy City Attorney Bernard in den Bosch expanded the discussion to include additional City attorneys based solely on their involvement in litigation with Plaintiff, rather than any procurement-related function or evaluation of bidder qualifications. "Jeff and Ryan both have lawsuits with BJ's Fleetwash. That doesn't mean that they need necessarily be looped into the discussion, but I will certainly copy them both on the emails." (Ex. R; BJS-375A)

54. After expanding the discussion to include additional attorneys, including Ryan Wiesen and Jeffery Bloom, the Law Department proposed that the City allow BJ's Fleet Wash to perform the work and, if performance issues arose, "go after his performance bond." This recommendation was made in the context of Plaintiff's litigation history with the City and was not tied to any identified deficiency in Plaintiff's qualifications or capability to perform the work. (Ex. M; BJS-373A)

55. Internal communications reflect that the Law Department introduced the concept of splitting the contract award and recommended that the Department allocate work based on facility size as a more "I think dividing on size and/or geographic location or something objective makes it more defensible." approach. (Ex. N; BJS-374A)

56. Following this guidance, Defendant Hannah R. Adeponu divided the contract by space count, assigning BJ's Fleet Wash a greater number of locations while awarding a separate portion of the work to Rolling Suds at a substantially higher overall cost. "However, after further review of the split of the facilities awarded it was noticed that the space counts were not split in order to optimize the benefit of awarding to the bidders" (Ex. A; BJS-378A)

57. Defendants excluded BJ's Fleet Wash from future contracting opportunities, and in internal communications, a City Defendant Karen Taylor stated, 'Do you think he finally understands he may have shot himself in the foot?,' directly referencing the consequences of Plaintiff's protest. (Ex. L, BJS-384A)

58. Following the 2024 award, BJ's Fleet Wash was excluded from subsequent bid solicitations for similar services, while other contractors were invited to submit bids for the 2025 season. (Ex. JJ, BJS-466A). This exclusion constitutes a de facto debarment, imposed without notice, stated cause, or opportunity to be heard.

59. The foregoing facts support a plausible claim that Defendants retaliated against Plaintiff by altering contracting decisions and excluding BJ's Fleet Wash LLC from opportunities based on Plaintiff's protected activity. Courts recognize that denial or manipulation of government contracts constitutes actionable retaliation when motivated by protected speech. See Minn. State Coll. Student Ass'n v. Cowles; Oscar Renda Contracting, Inc. v. City of Lubbock.

60. Internal communications referencing Plaintiff's prior litigation and directing modified treatment support a reasonable inference of retaliatory motive and causation. See Peterson v. Kopp; Sanimax USA, LLC v. City of South St. Paul. These actions, including exclusion from future bid opportunities, would deter a person of ordinary firmness from engaging in protected activity.

61. The record further reflects that Defendants' conduct was not based on neutral procurement criteria, but instead involved coordinated decision-making influenced by Plaintiff's protected activity. A municipality may be held liable where such a custom or practice serves as the moving force behind the constitutional violation. See Yang v. City of Minneapolis; Hutchcroft-Darling v. Boecker; Troupe v. Young.

62. Accordingly, the facts establish a direct causal connection between Plaintiff's protected activity and the adverse treatment of his business, supporting liability under 42 U.S.C. § 1983 for First Amendment retaliation.

## E. Law Department Exceeded Its Advisory Role

63. The Omaha Municipal Code limits the Law Department to providing legal advice and representing the City in legal matters, including advising City officials and handling litigation in which the City is a party. It does not assign the Law Department an independent investigative or administrative role in contractor evaluation or discrimination complaints. (Ex. O, BJS-06A)

64. Defendant City Attorney Bernard in den Bosch confirmed that the Law Department's role is limited to providing legal advice, while client departments retain final decision-making authority. In written correspondence, Defendant in den Bosch explained that the Law Department "review[s] specific factual circumstances, apply[ies] the appropriate law, and then provide[s] advice to its clients," and that "[t]he clients then make decisions based on that legal advice." (Ex. P, BJS-108A)

65. Defendant invoked litigation concerns to prevent the Human Rights and Relations Department ("HRRD") from responding to questions within its statutory authority during a City Council proceeding. The inquiry concerned the general operation of the SEB program and did not implicate privileged litigation strategy or confidential legal advice. The directive, issued while Plaintiff was present and after Plaintiff had engaged in protected activity, prevented HRRD from performing its ordinance-mandated function in a public forum. (Ex. H, BJS-321A, Tr. 7:12–8:7)

66. This restriction, coupled with the subsequent issuance of a substantive interpretation aligned with the City Attorney's position, supports a reasonable inference that the invocation of litigation concerns was not applied for legitimate legal purposes, but instead functioned to suppress contemporaneous interpretation and control the application of the ordinance as it related to Plaintiff.

67. Defendant City Attorney Bernard in den Bosch did not merely provide legal advice regarding the award of the contract, but instead directed the restructuring of the procurement by instructing that it be divided based on size. In internal communications, Defendant in den Bosch stated, "I think dividing on size and/or geographic location or

something objective makes it more defensible." This statement reflects a focus on identifying a justification that would appear defensible, rather than applying preexisting procurement criteria. (Ex. N; BJS-374A)

68. This instruction was implemented by the department after the procurement process had commenced, constituting a post hoc alteration of the contract structure. Such conduct reflects operational involvement in the bidding process, rather than neutral legal guidance, and directly influenced the outcome of the award.

69. City departments responded to similarly situated bidders, including RTG and BMI, on multiple occasions without the use of scripted responses or legal cautions, and without Law Department intervention in routine communications. In contrast, Defendants directed City departments to issue coordinated, scripted responses to Plaintiff outside normal procedures, creating the appearance of legitimacy while avoiding direct engagement with Plaintiff's concerns. (Ex. LL, BJS-428A; Ex. MM, BJS-430A)

70. In internal communications, Defendant City Attorney Jeffrey Bloom instructed a department to "keep this simple" and to respond using specific, pre-drafted language: "The City Clerk's office has not received a request for a City Council agenda item… Once we receive that request, it will be placed on the City Council's agenda." This same language was later repeated verbatim in official responses, confirming that the communication was predetermined rather than independently generated. (Ex. T, BJS-463A)

71. This deviation from standard practice, combined with the disparate treatment of Plaintiff as compared to other bidders, supports a reasonable inference of coordinated response control and pretext. These actions occurred after Plaintiff engaged in protected activity and hindered his ability to obtain accurate information and meaningfully challenge procurement decisions.

72. In 2025, Defendant City Attorney Bernard in den Bosch initiated a records-based inquiry into Plaintiff Rodney Johnson's residency status and relied on those findings to justify the imposition of fees. In written correspondence, Defendant in den Bosch stated: "We have become aware that you are no longer a resident of the State of Nebraska. A search of records indicates that not only do you have a residence in Georgia, but that you now have a Georgia driver's license… your state of residence becomes relevant due to some amendments to Nebraska's public records laws that occurred in 2024." (Ex. S, BJS-446A at 11).

73. Legislative Bill 43 ("LB 43"), effective March 27, 2024, amended Nebraska's public records laws. Following the enactment of LB 43, Plaintiff Rodney Johnson and BJ's Fleet Wash submitted multiple public records requests—each relating to procurement matters

affecting BJ's Fleet Wash—and received responsive records without any inquiry into residency status or the imposition of residency-based fees.

74. The subsequent invocation of residency-based restrictions, after a consistent course of access under the same statutory framework, supports a reasonable inference that the stated justification was not applied uniformly, but instead functioned as a pretext to impose barriers on Plaintiff's access to public records.

75. The foregoing conduct demonstrates that Law Department Defendants exceeded their lawful advisory role and engaged in administrative and operational decision-making affecting Plaintiff's rights, including procurement, access to information, and interdepartmental directives. Qualified immunity does not shield officials who act outside the scope of their authority or who knowingly violate clearly established constitutional rights. See Kulkay v. Roy; Mendoza v. United States Immigration & Customs Enforcement; Scott v. Tempelmeyer.

76. At the time of Defendants' actions, it was clearly established that government officials may not retaliate against protected First Amendment activity, selectively restrict access to public processes, or interfere with statutory rights through arbitrary or discriminatory conduct. A reasonable official would understand that using legal authority to influence or control administrative outcomes for retaliatory purposes violates constitutional protections. See Swearingen v. Judd; Aden v. City of Bloomington.

77. Because Defendants' actions were taken under color of law, but outside the bounds of their lawful authority and in violation of clearly established rights, they are not entitled to qualified immunity in their individual capacities. See also VanHorn v. Oelschlager.

## F. Pattern, Practice Custom and Escalation

78. Defendants' conduct reflects a consistent pattern of treating Plaintiff's protected activity as a negative factor in governmental decision-making. In internal communications, City of Omaha Contract Services Coordinator Steven Slater stated: "While there have been no legal actions specifically initiated against our department, I do consider legal action against the city on other matters as adverse action and feel our actions in working through the custodial issues are being influenced by that fact." This statement demonstrates that Plaintiff's prior legal activity was affirmatively considered and influenced Defendants' handling of contract-related decisions. (Ex. U, BJS-153A)

79. Defendants further directed City personnel to alter their normal interactions with Plaintiff based on his prior legal activity. In internal communications, a City official stated: "The Law Department asks that we do not respond socially like this to Rodney, and that we should only send the initial morning emails because these replies are what he can use

against us in court." This directive reflects an intentional restriction on routine communication with Plaintiff due to his prior litigation activity. (Ex. V, BJS-177A)

80. Defendants also treated Plaintiff and his business, BJ's Fleet Wash LLC, as functionally indistinguishable in their communications and decision-making. In coordinated discussions involving the Law Department and the Human Rights and Relations Department, the return of a performance bond issued in connection with BJ's Fleet Wash was tied to Plaintiff's willingness to withdraw. A Human Rights and Relations official stated: "I have one question. If Mr. Rodney agrees to withdraw, what is the process for him to get his bond back?" This exchange reflects that Defendants linked Plaintiff's personal actions to the status of the company's contractual rights. (Ex. W, BJS-184A)

81. Defendants' pattern of conduct extended to the suppression of responsive public records. In connection with records involving contractor BMI Janitorial, Defendants instructed City personnel: "DO NOT PROVIDE OR SEARCH FOR EMAILS ON THIS," including communications between City employees and third parties. The suppression of these records was significant enough that the Court imposed monetary sanctions for noncompliance in related proceedings. These actions reflect a pattern of withholding responsive information in matters involving Plaintiff. (Ex. X, BJS-228A)

**G. Judicial Findings in BJ's Fleet Wash, LLC v. City of Omaha, Case No. 8:22-cv-00421 (D. Neb. Mar. 4, 2025)**

82. In BJ's Fleet Wash, LLC v. City of Omaha, Case No. 8:22-cv-00421 (D. Neb. Mar. 4, 2025), the Court recognized that the evidentiary record supports reasonable inferences of differential treatment, retaliatory motive, and intentional avoidance of contracting with BJ's Fleet Wash. The Court held that BJ's presented sufficient evidence to proceed on claims of disparate treatment, First Amendment retaliation, and race discrimination, and that a reasonable jury could conclude Defendants' actions were motivated, at least in part, by protected activity, including criticism and oversight of City practices. (Ex. Y, BJS-421A at 33).

83. The Court further confirmed that such protected activity—including the filing of lawsuits and public records requests—is protected under the First Amendment. (Id.).

84. Although the Court did not expressly address whether Defendants treated Rodney Johnson and BJ's Fleet Wash as a single actor, its findings—linking Johnson's protected activity to adverse actions taken against BJ's—support a reasonable inference that Defendants did not meaningfully distinguish between Johnson and his business in their decision-making.

85. The Court identified multiple facts supporting an inference of unlawful conduct, including that "the record could lead to a reasonable inference that the city officials wanted to avoid contracting with BJ's and took multiple measures to do so," along with "numerous instances of the city officials' arguable violations of or inability to follow the city's own laws and procedures," and "contradictions in the city officials' explanations." (Ex. Y, BJS-421A at 29).

86. The Court also noted evidence that "each of the city officials individually treated BJ's worse than BMI" and that Defendants "preferred to work with another vendor and took steps to avoid contracting with BJ's," with the Court further recognizing that a jury could attribute such conduct to "criticism and oversight of the city's practices." (Id. at 30, 34).

## H. Contract Termination, De Facto Debarment, and Instability Imposed on Plaintiff's Business

87. Defendants further disrupted Plaintiff's business operations by terminating existing contracts, refusing to award contracts for which Plaintiff was qualified, and creating instability in Plaintiff's ability to rely on continued business relationships.

88. Defendants' conduct operated as a de facto debarment, excluding Plaintiff and his business from future contracting opportunities without formal notice, stated cause, or opportunity to be heard. Plaintiff was effectively prevented from competing on equal terms despite remaining qualified and eligible for such work.

89. In at least one instance, Defendants offered Plaintiff a contract renewal and then rescinded that offer within hours, eliminating Plaintiff's reasonable expectation of continued work.

## I. Causal Connection Between Defendants' Conduct and Plaintiff's Financial Collapse

90. As a direct result of Defendants' conduct described above, Plaintiff experienced a substantial and immediate loss of income and business stability. This disruption impaired Plaintiff's ability to maintain consistent cash flow, meet financial obligations, and sustain the financial position necessary to operate his business.

91. The resulting financial strain caused a material deterioration in Plaintiff's creditworthiness, including a significant decline in credit score and overall financial standing.

92. Because Plaintiff's access to commercial financing depended on his credit profile and financial stability, the deterioration of his financial condition resulted in the withdrawal and loss of previously committed financing, including approximately $1.3 million for the

Scooter's Coffee development project. The commitment expressly required that there be "no material adverse change in the condition, financial or otherwise, operations, properties, assets or prospects of the Borrower or any Guarantor," and Defendants' conduct directly caused the failure of that condition.

93. The loss of financing, in turn, caused the collapse of the project, the loss of Plaintiff's invested capital, and the destruction of Plaintiff's business expectancy.

94. Accordingly, Defendants' conduct set in motion a foreseeable chain of events—loss of income, deterioration of credit, loss of financing, and ultimate business failure—each of which was a direct and proximate result of Defendants' actions.

# IV. CLAIMS FOR RELIEF

## COUNT I

**First Amendment Retaliation (42 U.S.C. § 1983)**
(Against All Defendants)

Plaintiff incorporates all preceding paragraphs.

95. Plaintiff engaged in protected activity.

96. Defendants took adverse actions that would chill a person of ordinary firmness.

97. Defendants' actions were motivated by Plaintiff's protected activity.

98. Defendants acted under color of state law.

99. As a result, Plaintiff suffered damages.

## COUNT II

**Municipal Liability (Monell) – 42 U.S.C. § 1983**
(Against City of Omaha)

100. Plaintiff incorporates all preceding paragraphs.

101. The constitutional violations were caused by:

- official policy;

- custom and practice; and/or

- actions of final policymakers.

The City's failure to prevent or correct the conduct constitutes deliberate indifference.

## COUNT III

**Individual Capacity Liability – 42 U.S.C. § 1983**
(Against Individual Defendants)

102. Plaintiff incorporates all preceding paragraphs.

103. Each individual Defendant personally participated in the constitutional violations.

104. Defendants acted intentionally and with knowledge of Plaintiff's protected activity.

105. Defendants' conduct violated clearly established constitutional rights.

# V. DAMAGES

106. Plaintiff suffered:

- financial loss;

- reputational harm;

- denial of access to public processes; and

- emotional distress.

# VI. PRAYER FOR RELIEF

Plaintiff requests:

A. Compensatory damages;
B. Punitive damages against individual defendants;
C. Declaratory relief;
D. Injunctive relief;
E. Costs and fees under 42 U.S.C. § 1988;
F. Any other relief the Court deems just.

# VII. JURY DEMAND

Plaintiff demands a trial by jury.

DATED: 5-1-2026

**Rodney Johnson**
[Address]
[Phone] 6716 Noothndy Pr
[Email] Omaha NE 60112

## PLAINTIFF'S DAMAGES STATEMENT

Plaintiff Rodney Johnson, proceeding pro se, submits the following statement of damages resulting from Defendants' conduct, including but not limited to economic harm, reputational injury, emotional distress, and constitutional injury.

## I. OVERVIEW OF DAMAGES

1. As a direct and proximate result of Defendants' actions, Plaintiff suffered a substantial and measurable financial collapse, accompanied by significant personal and emotional harm. These damages are supported by documentary evidence, including Plaintiff's Experian credit report dated April 14, 2026.

## II. PRE-DAMAGE CREDIT STABILITY

2. Prior to the events giving rise to this action, Plaintiff maintained a long-standing history of responsible financial behavior and timely payment performance across numerous credit accounts.
3. Plaintiff's credit history reflects decades of consistent payment compliance, including:
4. Multiple accounts marked "Paid, Closed/Never late" Long-term credit relationships spanning from approximately 1999 through 2023 (Ex. Z; BJS-500A; Pg 3-4)

A Experian Credit Report demonstrated ability to manage revolving and installment credit without delinquency

5. This pattern establishes that Plaintiff did not have a history of financial instability prior to Defendants' conduct. (Ex. Z, BJS-500
6. Capital One (authorized user), opened Jul. 25, 2003, closed Jul. 2019 — paid, closed, never late.

7. First Premier Bank (credit card), opened Oct. 31, 2013, closed Nov. 2016 — paid, closed, never late.

8. Metro Credit Union (credit card), opened Dec. 9, 2013, closed Jan. 2021 — paid, closed, never late.

9. U.S. Bank (credit card), opened Mar. 1, 2015, closed Dec. 2018 — paid, closed, never late.

10. Nebraska Enterprise Fund (business loan), opened May 9, 2016, closed Jul. 2018 — paid, closed, never late.

11. Centris Credit Union (auto loan), opened Nov. 9, 2016, closed Feb. 2018 — paid, closed, never late.

12. Chrysler Capital (auto lease), opened Dec. 4, 2018, closed Aug. 2020 — paid, closed, never late.

13. JPMCB Auto (auto lease), opened Jun. 18, 2019, closed Sep. 2020 — paid, closed, never late.

14. Freedom Mortgage (FHA mortgage), opened Apr. 11, 2019, closed Jul. 2020 — paid, closed, never late.

15. Nationstar / Mr. Cooper (mortgage), opened Apr. 11, 2019, closed Oct. 2019 — transferred/closed, never late.

## III. POST-CONDUCT FINANCIAL COLLAPSE

16. Following Defendants' actions, Plaintiff's financial condition deteriorated significantly, as reflected in his credit profile. (Ex. Z; BJS-500

Plaintiff's Experian credit report shows: (Ex. Z; BJS-500)

17. Seventeen (17) accounts with late payments (p. 1)
18. A credit score of 562, classified as poor (p. 1)
19. Multiple accounts in severe delinquency, including 60-, 90-, 120-, and 180-day late statuses (p. 1)
20. Extensive credit utilization exceeding 100% (p. 4)

Additionally, Plaintiff experienced a pattern of escalating financial distress across multiple accounts, including: (Ex. Z; BJS-500A)

21. Home equity accounts with repeated delinquency (Centris; Veridian) (p. 1)
22. Mortgage delinquency exceeding $59,000 past due (CMG Mortgage) (p. 1)
23. Auto loan delinquencies with more than twenty (20) late payments (JPMCB Auto) (p. 1)

This deterioration reflects a systemic financial breakdown, not isolated incidents.

## IV. CHARGED-OFF AND DEROGATORY ACCOUNTS

Plaintiff's Credit report further reflects multiple accounts that progressed from delinquency to charge-off status, including: (Ex. Z; BJS-500A)

24. Multiple Affirm accounts charged off following progressive delinquency (pp. 1–2)
25. Two American Express accounts charged off with significant balances (p. 2)
26. Three Capital One accounts charged off, including accounts dating back prior to 2019 (p. 2)
27. Cobalt Credit Union auto loan charged off following repossession (p. 3)
28. SYNCB/Car Care account charged off after escalating delinquency (p. 3)

These accounts demonstrate a progression from initial delinquency to severe credit impairment.

## V. CAUSATION AND TIMING

The timing and pattern of Plaintiff's credit deterioration directly correspond with Defendants' conduct.

29. Plaintiff's credit history shows:
30. A stable, consistent payment history prior to 2023

31. A rapid and sustained increase in delinquencies and charge-offs following the events at issue

32. This temporal relationship supports a direct causal connection between Defendants' actions and Plaintiff's financial harm.

Section V → Subsection A

A. Lost Financing and Business Opportunity (Scooter's Coffee Development)

33. Prior to Defendants' unlawful conduct, Plaintiff Rodney Johnson personally funded and developed a commercial retail project for the construction and operation of a Scooter's Coffee franchise location.

34. Plaintiff used his personal capital, credit, and financial resources to advance the project. Although a limited liability company was formed to operate the franchise, Plaintiff remained the primary financial obligor, investor, and guarantor for all material aspects of the project, including financing, lease obligations, and development costs.

35. Plaintiff paid approximately $50,000 in franchise fees and invested over $90,000 in construction and development, and the project progressed to the point where construction had commenced. Plaintiff also entered into a ground lease and incurred additional expenses, including travel and training costs required for franchise development.

36. Plaintiff obtained approval, or conditional approval, for approximately $1.3 million in commercial financing, contingent upon a 20% capital infusion, which Plaintiff satisfied through his financial contributions. (Ex. PP; BJS-607A

37. Following Defendants' retaliatory and discriminatory conduct, Plaintiff's financial condition and creditworthiness materially deteriorated, rendering him unable to meet final underwriting requirements. As a result, all financing options—including conventional and SBA loans—were withdrawn.

38. Plaintiff made construction related purchases from personal funds (Ex. NN; BJS-605a; Ex. OO; BJS-606A)

39. Plaintiff lost access to approximately $1.4 million in financing;

40. The project could not be completed and was abandoned;

41. Plaintiff lost all invested capital, including franchise fees, construction costs, lease obligations, and related expenses;

42. Plaintiff incurred unrecoverable travel, training, and development costs; and

43. Plaintiff lost the anticipated revenue, profits, and long-term business value of the franchise.

44. Plaintiff also suffered the loss of a concrete and reasonably certain business expectancy. Prior to the loss of financing, Plaintiff developed a financial pro

forma based on franchise data and comparable performance. Because the project had secured financing approval, satisfied capital requirements, and commenced construction, the anticipated business operations were not speculative and are capable of calculation through financial records and expert analysis. (Ex. SS; BJS-610)

Section V → Subsection B  Plaintiff's Personal Investment and Pre-Operational Status of the Business

45. Plaintiff Rodney Johnson personally funded and developed the proposed Scooter's Coffee project using his own capital, credit, and financial resources. The funds used to finance the project included proceeds from an inheritance received by Plaintiff, as well as income derived from his business operations.

46. Prior to the development of the project, no separate business entity existed with respect to the proposed franchise. Although a limited liability company was later formed for the purpose of operating the franchise, that entity had no independent financial existence, revenue, credit, or operations at the time the relevant investments were made. (Ex. QQ; BJS-608A; Ex. RR; BJS-609A))

47. All material financial obligations associated with the project—including franchise fees, construction expenditures, lease commitments, and financing requirements—were undertaken and satisfied by Plaintiff in his individual capacity. Plaintiff personally paid approximately $50,000 in franchise fees and invested in excess of $90,000 toward construction and development costs prior to any operational existence of the business. (Ex. TT; BJS-611A)

48. At all relevant times, the viability of the project depended entirely on Plaintiff's personal financial resources, creditworthiness, and capital investment. The limited liability entity formed for future operations did not generate revenue, obtain independent financing, or assume financial risk separate from Plaintiff.

## VI. ECONOMIC DAMAGES

As a result of the foregoing, Plaintiff has suffered economic damages including:

49. Loss of creditworthiness and access to financing (Ex. AA BJS-501)
50. Increased cost of borrowing due to reduced credit score
51. Impairment of ability to obtain bonding and capital necessary for business operations bonding Agent Gemma Fendler stated to Johnson "Unfortunately we

also have the credit score issue." BJs Fleet Wash Denied a Performance bond based on Johnson Credit dip (Ex. BB BJS-502)

52. Accumulation of delinquent debt and associated penalties

These damages are ongoing and continue to affect Plaintiff's financial condition.

## VII. NON-ECONOMIC DAMAGES

53. Plaintiff has also suffered significant non-economic harm, including:
54. Severe stress and anxiety resulting from financial instability
55. Emotional distress associated with mounting debt and loss of financial security
56. Reputational harm related to diminished creditworthiness
57. Loss of personal dignity and financial independence
58. Affidavit of Pastor Ambris

These harms were a direct consequence of Plaintiff's financial collapse.

## VIII. CONCLUSION

Plaintiff's damages are not the result of isolated financial decisions, but rather reflect a documented and sustained deterioration following Defendants' conduct.

The evidence demonstrates:

A clear pre-event history of financial stability
A post-event pattern of widespread delinquency and charge-offs
A direct causal relationship between Defendants' actions and Plaintiff's damages

Plaintiff respectfully submits that these damages are substantial, ongoing, and compensable under applicable law.

Dated: 5-1-2026

Respectfully submitted,

Rodney Johnson
Plaintiff, Pro Se

Bates # EX. A; BJS-378A

 Gmail

**Tammy Sena (PWks) <tammy.sena@cityofomaha.org>**

## Re: Fall Power Washing Bids

1 message

**Hannah Adeponu (PWks)** <hannah.adeponu@cityofomaha.org>                    Mon, Aug 12, 2024 at 9:22 AM
To: "Karen Taylor (PWks-Contractor)" <Karen.Taylor@cityofomaha.org>, "Miranda Edmonds (PWks-Contractor)" <miranda.edmonds@cityofomaha.org>, "Tammy Sena (PWks)" <tammy.sena@cityofomaha.org>
Cc: "Bernard in den Bosch (Law)" <Bernard.Bosch@cityofomaha.org>

Hey Karen,

I got a call from Purchasing on our low bidder saying that he has contested bid awards previously so wanted to be a bit more careful in our communications to him. As such, I reached out to General Services and the Law Department and found out the following:

- BJs Fleet wash has two lawsuits with the City
- Law noted that the selection of contracts based on our experience with the vendors could be argued to be targeting
- GS noted that our reasoning for awarding to multiple bidders being to ensure the expediency of the completion of the work as adequate

Law suggested that we allow BJs to choose which garages they wanted to perform. I provided an alternative that we split the award based on space count to closely award both BJs Fleet wash and Rolling Suds similar counts (ended up with BJs Fleet wash having more spaces than Rolling Suds). This would end in the split of work being:

- BJ's Fleet Wash (Total 2402 spaces) Bid Total $9,900.00
    - Park 8 (1286 spaces)
    - Mercantile (660 spaces)
    - Park 5 (456 spaces)
- Rolling Suds (Total 1733 spaces) Bid Total $23,350.00
    - Park 1 (711 spaces)
    - Park 6 (939 spaces)
    - Park 3 (83 spaces)



I believe this will protect our division and the City and would like to move forward with it, so I would like you to respond to BJ's Fleet wash with the following:

*"Mr. Johnson,*

*The solicitation was bid with the intention to award to more than one bidder as this will produce the most expedient timeline for completion of all the garages to be power washed this fall. With the winter months approaching it is vital that we perform this maintenance expeditiously to uphold the condition of our facilities. However, after further review of the split of the facilities awarded it was noticed that the space counts were not split in order to optimize the benefit of awarding to the bidders with the two lowest bids. Therefore we have resubmitted the award to adjust the space counts and have submitted your award to be considered by the City Council for the following garage facilities:*

- *BJ's Fleet Wash (Total 2402 spaces)*
    - *Park 8 (1286 spaces)*
    - *Mercantile (660 spaces)*
    - *Park 5 (456 spaces)*

*Please let me know if you have any further questions. "*

Do you have any concerns with this approach? If this is good with you, Tammy can you please contact Purchasing and General Services to adjust the awards as shown above?

Thank you,

**Hannah R. Adeponu, MA, CAPP**
Parking and Mobility Manager (Interim)
O: 402-444-PARK(7275) D: 402-444-3364
1819 Farnam Street, Ste. 308 · Omaha, NE 68183
Schedule a Meeting

 Gmail                                Carl J. Martin (Prch) <carl.martin@douglascounty-ne.gov>

## Re: Bid unsealed - CI-2024-0297 (Power Washing Park Omaha Garages)
1 message

**Tammy Sena (PWks)** <Tammy.Sena@cityofomaha.org>                Fri, Aug 2, 2024 at 1:50 PM
To: "Carl J. Martin (Prch)" <carl.martin@douglascounty-ne.gov>
Cc: "Hannah Adeponu (PWks)" <hannah.adeponu@cityofomaha.org>

Carl,
We're going to award the Power Washing bid to the 2 lowest bids outlined in yellow below.  Please let me know when the award is complete so I can submit these through GS 2.0 and get a Council date scheduled.

1.  BJ's Fleet Wash - P3, P5, Mercantile - $5,700
2.  Rolling Suds of Omaha - P1, P6, P8 - $41,700
**Total $47,400**

| | SEB ? | P1 | P3 | P5 | P6 | P8 | Mercantile | |
|---|---|---|---|---|---|---|---|---|
| BJ'S Fleet Wash LLC (RODNEY JOHNS( | Y | $5,000.00 | $800.00 | $2,900.00 | $3,200.00 | $5,000.00 | $2,000.00 | $18,900.00 |
| Rolling Suds of Omaha (Jahk Investm | Y | $9,600.00 | $1,250.00 | $7,400.00 | $12,500.00 | $19,600.00 | $9,600.00 | $59,950.00 |
| T-Squared Maintenance | N | $14,931.00 | $1,700.00 | $8,400.00 | $16,800.00 | $27,006.00 | $10,800.00 | $79,637.00 |
| Navarro Lawn & Landscape | Y | $16,105.00 | $1,743.00 | $11,050.00 | $23,169.00 | $31,000.00 | $13,900.00 | $96,967.00 |
| OHMS-NE-LLC | | $20,000.00 | $3,320.00 | $13,000.00 | $28,000.00 | $44,000.00 | $15,000.00 | $123,320.00 |
| Jet Set II,LLC | | $28,100.76 | $4,000.00 | $18,240.00 | $37,560.00 | $51,440.00 | $26,182.38 | $165,523.14 |
| Huskins services | | $28,440.00 | $7,817.65 | $25,126.70 | $38,237.87 | $67,769.79 | $27,200.00 | $194,592.01 |
| Modern Pressure Washing LLC | | $43,896.72 | No Bid | $51,830.96 | $64,788.70 | $89,045.87 | No Bid | $249,562.25 |

Thanks!

**Tammy J. Sena**
City Parking & Mobility, Office Manager
**O:** 402-444-PARK(7275) **D: 402-444-1791**
1819 Farnam Street, Ste. 308 · Omaha, NE 68183
Ⓟ *Park Omaha*

EX. HH

On Wed, Jul 17, 2024 at 3:00 PM Carl J. Martin (Prch) <carl.martin@douglascounty-ne.gov> wrote:
> Hi,
>
> Your bid has been unsealed and is ready for you to review on Ionwave.  Please use the attached Job Aid to assist you in finding your documents.
> (I've attached the tab also)
>
> Once you have determined who you will award to:
>
> >Notify Purchasing of Award:  Email me who you are awarding the bid contract to.
>
> >City Council Resolution:  Schedule the bid award to go before the City Council for approval, if warranted by the award amount.
>
> >Oracle Requisition (REQ):  After a resolution is passed approving the bid award, enter a REQ in Oracle to fund the expenditure.
> The REQ should include the following:
>         Attach the bid tabulation, and
>         Attach the City Council approved resolution

Subject: Re: Fall Power Washing Bids
From: "Bernard in den Bosch (Law)" <Bernard.Bosch@cityofomaha.org>
Date: 8/9/2024, 1:09 PM
To: "Hannah Adeponu (PWks)" <hannah.adeponu@cityofomaha.org>
CC: "Heather Tippey Pierce (PWks)" <htpierce@cityofomaha.org>, "Jeffrey
Bloom (Law)" <jeffrey.bloom@cityofomaha.org>, "Ryan Wiesen (Law)"
<Ryan.Wiesen@cityofomaha.org>

*EX. M*

I think dividing on size and/or geographic location or something
objective makes it more defensible.  If Ryan or Jeff has any input,
please feel free.

*Bernard J. in den Bosch
Deputy City Attorney
City of Omaha - Law Department
1819 Farnam Street, Suite 804
Omaha, NE  68183
Telephone: (402) 444-5022
Facsimile: (402) 444-5125*
*E-Mail: *bernard.bosch@cityofomaha.org
<mailto:bernard.bosch@cityofomaha.org>

The information contained in this email contains confidential
information from the Omaha City Attorney's Office that is intended
solely for the recipient set forth above. Any redistribution, copying or
other dissemination of the contents of this transmission is prohibited.
Please be advised that the contents of this email may be intercepted or
diverted through transmission over the internet and therefore the
security of this email cannot be guaranteed by the sender.

On Fri, Aug 9, 2024 at 12:22 PM Hannah Adeponu (PWks)
<hannah.adeponu@cityofomaha.org <mailto:hannah.adeponu@cityofomaha.org>>
wrote:

> I agree that he may claim that it is targeting. The prices that he
> submitted are very low and certainly raise an eyebrow compared to
> the other bids. However, I want to ensure we are not being unfair or
> opening ourselves up to any liability here. So I would be ok with
> him choosing which three he wants if you feel that is the only way
> to split up the work. But would much prefer to adjust the selections
> so that they both align closely on the number of stalls that will be
> included for each vendor. Is that an acceptable alternative? I would
> even give him more spaces than the other if that would be easy for
> him to accept, but allow for us to accomplish this in the short time
> frame we have before things get wintery...
>
> If so, I would do the following split:
>
>  * BJ's Fleet Wash (Total 2402 spaces) Bid Total $9,900.00
>      o Park 8 (1286 spaces)

EX. M

    o Mercantile (660 spaces)
    o Park 5 (456 spaces)
 * Rolling Suds (Total 1733 spaces) Bid Total $23,350.00
    o Park 1 (711 spaces)
    o Park 6 (939 spaces)
    o Park 3 (83 spaces)

Let me know your thoughts please.

*Hannah R. Adeponu, MA, CAPP*
Parking and Mobility Manager (Interim) *
*
*O:*402-444-PARK(7275)*D: *402-444-3364
1819 Farnam Street, Ste. 308 · Omaha, NE 68183
<https://maps.google.com/?
q=1819+Farnam+Street,+Ste.+308+%E2%88%99+Omaha,+NE+68183&entry=gmail&source=g>
Schedule a Meeting <https://calendar.app.google/7LMN8RX3cNDXn6Zv6>
<https://www.parkomaha.com/>

On Fri, Aug 9, 2024 at 12:04 PM Bernard in den Bosch (Law)
<Bernard.Bosch@cityofomaha.org
<mailto:Bernard.Bosch@cityofomaha.org>> wrote:

That is what I assumed, but wanted to confirm.  I do have some
concerns about how it is divided since it appears you are
talking about giving him the three smallest(cheapest) and giving
the other three to the other bidder.  Is there a reason for
that?   It could be seen as targeting.  I am assuming that some
of the jobs can be done more quickly than others, but
theoretically they all qualified to do the work.  Could you give
him a choice as to which three?  Is there a reason that we
believe that a vendor could not take care of all 6 garages?

As Ryan and I discussed, based on our history with him, it is
better to let him try to do the work and if he fails, go after
his performance bond.

*Bernard J. in den Bosch
Deputy City Attorney
City of Omaha - Law Department
1819 Farnam Street, Suite 804
Omaha, NE  68183
Telephone: (402) 444-5022
Facsimile: (402) 444-5125*
*E-Mail: *bernard.bosch@cityofomaha.org
<mailto:bernard.bosch@cityofomaha.org>

The information contained in this email contains confidential
information from the Omaha City Attorney's Office that is

intended solely for the recipient set forth above. Any redistribution, copying or other dissemination of the contents of this transmission is prohibited. Please be advised that the contents of this email may be intercepted or diverted through transmission over the internet and therefore the security of this email cannot be guaranteed by the sender.

Ex. R

On Fri, Aug 9, 2024 at 11:10 AM Hannah Adeponu (PWks) <hannah.adeponu@cityofomaha.org <mailto:hannah.adeponu@cityofomaha.org>> wrote:

We wanted to split up the work according to the highlighted cells.

*Hannah R. Adeponu, MA, CAPP*
Parking and Mobility Manager (Interim) *
*
*O:*402-444-PARK(7275)*D: *402-444-3364
1819 Farnam Street, Ste. 308 · Omaha, NE 68183
<https://maps.google.com/?
q=1819+Farnam+Street,+Ste.+308+%E2%88%99+Omaha,+NE+68183&entry=gmail&source=g>
Schedule a Meeting
<https://calendar.app.google/7LMN8RX3cNDXn6Zv6>
<https://www.parkomaha.com/>

On Fri, Aug 9, 2024 at 10:40 AM Bernard in den Bosch (Law) <Bernard.Bosch@cityofomaha.org <mailto:Bernard.Bosch@cityofomaha.org>> wrote:

Jeff and Ryan both have lawsuits with BJ's Fleetwash. That doesn't mean that they need necessarily be looped into the discussion, but I will certainly copy them both on the emails.

One question - when I looked at the original email and looked at the bid tabulation by location, there were numbers from both contractors that were highlighted. What is that intended to represent?

*Bernard J. in den Bosch
Deputy City Attorney
City of Omaha - Law Department
1819 Farnam Street, Suite 804
Omaha, NE  68183
Telephone: (402) 444-5022
Facsimile: (402) 444-5125*
*E-Mail: *bernard.bosch@cityofomaha.org
<mailto:bernard.bosch@cityofomaha.org>



Subject: Re: Rolling suds operation plan
From: "Hannah Adeponu (PWks)" <hannah.adeponu@cityofomaha.org>
Date: 9/5/2024, 8:55 AM
To: "Karen Taylor (PWks-Contractor)" <Karen.Taylor@cityofomaha.org>

Could be.

Hannah R. Adeponu, MA, CAPP
Parking and Mobility Manager
O:  402-444-PARK(7275)  D: 402-444-3364
1819 Farnam Street, Ste. 308 • Omaha, NE 68183
Schedule a Meeting

On Thu, Sep 5, 2024 at 8:53 AM Karen Taylor (PWks-Contractor)
<Karen.Taylor@cityofomaha.org> wrote:

     Do you think he finally understands he may have shot himself in
the foot?

     Thanks,

     Karen Taylor
     General Manager

     O  402-444-PARK(7275)    D  402-444-7566
     1819 Farnam Street, Suite 308 • Omaha, NE 68183
     Inline image 3

     ---------- Forwarded message ---------
     From: Bjswash <bjswash@yahoo.com>
     Date: Thu, Sep 5, 2024 at 8:38 AM
     Subject: Re: Rolling suds operation plan
     To: Karen Taylor (PWks-Contractor) <Karen.Taylor@cityofomaha.org>

     Oh ok thank you

>      On Sep 5, 2024, at 8:32 AM, Karen Taylor (PWks-Contractor)
<Karen.Taylor@cityofomaha.org> wrote:
>
>
>      It was delayed due to your dispute of the results.  After
raising questions on the awarded locations, rework was needed, which

EX. S

*services, complaints, or requests during the same period.*

*9. A complete history of janitorial services provided at Omaha Public Libraries including:*

*• Copies of performance bonds, contracts, ordinances, resolutions, award documents, and any contract change orders, addenda, or amendments related to the following solicitations:*

*• City of Omaha – Janitorial Services for Omaha Public Libraries, Opening Date: January 27, 2021 at 11:00 a.m. CT*

*• City of Omaha – Janitorial Services for Public Libraries, Opening Date: January 24, 2018 at 11:00 a.m. CST*

*10. All documentation related to the contract change to BMI, including the performance bond submitted by BMI after award.*

*11. Any ordinances, contract documents, performance bonds, service records, and termination documents related to Petties Unique Cleaning.*

This is the response required by Neb. Rev. Stat. § 84-712(4).

The Nebraska public records statutes allow persons the right to examine public records in the possession of public agencies during normal agency business hours, to make memoranda and abstracts from those public records, and to obtain copies of public records in certain circumstances. Those statutes do not require a public agency to review documents and create abstracts or other lists, to answer questions, or to create documents that do not otherwise exist. *See* Neb. Rev. Stat. § 84-712. In addition, preliminary materials, such as drafts, which are embryonic and remain subject to approval and issuance may not constitute a public record. See AG Opinion #1991-054. Although the Nebraska public records statutes provide for access to public documents, such access is not absolute. The statutes also provide for exceptions to disclosure by express and special provisions; there are 21 categories of documents that may be kept confidential from the public at the discretion of the agency involved. *See* Neb. Rev. Stat. § 84-712.05.

The City uses Google Business for its e-mail system. As a result, e-mails are not maintained on the City servers. In order to allow us to capture e-mails, the City has Google Vault accounts for employees in certain offices and for its management employees. It does have the ability to vault other individuals in order to do searches, but only the e-mails in the account at the time of vaulting will be available. In order to do a search of e-mail, we have to identify individual e-mail accounts and do searches and we cannot do an across the board City search.

We have started to gather the requested records. Due to the extent of the request, the need to search old records, and the absence of certain staff due to the holiday week, we anticipate that we will not be able to respond to your request until Friday, July 11, 2025. In the meantime, there is another issue that needs to be addressed. We have become aware

EX. 5

that you are no longer a resident of the State of Nebraska. A search of records indicates that not only do you have a residence in Georgia, but that you now have a Georgia driver's license. It appears that you turned in your Nebraska license. I understand that you own property in Nebraska, but your state of residence becomes relevant due to some amendments to Nebraska's public records laws that occurred in 2024. Whereas a resident is entitled to up to 8 hours of free staff time in responding to a public records request, a non-resident is not. Neb. Rev. Stat. § 84-712 provides "(d) For nonresidents of Nebraska, the actual added cost used as the basis for the calculation of a fee for records may include a charge for the proportion of the existing salary or pay obligation to the public officers or employees, including a proportional charge for the services of an attorney to review the requested public records, for the time spent searching, identifying, physically redacting, copying, or reviewing such records."

To date, we have expended between 3 and 4 hours of staff time in responding to your request. We anticipate another 3 to 4 hours. In total, we would anticipate a total of seven (7) hours, thought that number may increase or decrease. The rate of pay for the person performing these duties is $29.39 and as a result, we estimate a total cost of $205.73. I have not included any time for the City Attorney's Office to review the response. As a result, before we continue working on your request, we want assurance from you that you will reimburse the City its cost as contemplated by the statute and a deposit of $100. If we receive the deposit by July 7, 2025, we will still be able to complete the task by July 11. If not, we estimate that we can provide a response within five business days of receiving the deposit.

Section 84-712.03 of the Nebraska Revised Statutes may grant you the right to administrative or judicial review of this response. Please consult that Statute for further information.

If you have any questions about the legal basis for this response, you may contact me at 402.444.5022.

Very truly yours,

Bernard J. in den Bosch

Deputy City Attorney

c:    Kelli Grimm, Omaha Public Library



EX. AAA

## FIRST AMENDMENT TO GROUND LEASE

This FIRST AMENDMENT TO GROUND LEASE (the "First Amendment") is made and entered into as of _May 18, 2022_ (the "Effective Date"), by and **JBL Wisteria Shopping Center LLC** ("Landlord") and **Related by BJs, L.L.C.**, a Georgia limited liability company ("Tenant").

### RECITALS:

**WHEREAS**, Original Landlord and Original Tenant entered into that certain Ground Lease dated February 1, 2021 (the "Lease") including **Exhibits A through F,** consisting of approximately .36 acres of land, situated in the City of Snellville, County of Gwinnett, State of Georgia, more particularly described on **Exhibit A** of the Lease (the "Leased Premises"); and

**WHEREAS**, the parties desire to amend the Lease in accordance with the terms herein below stated.

### AMENDMENT:

**NOW THEREFORE**, upon the Effective Date, for and in consideration of the mutual covenants contained herein and other good and valuable consideration exchanged by each of the parties to this First Amendment, the receipt and sufficiency of which are hereby acknowledged, the Lease is hereby amended and the parties agree to as follows:

1    Change of Tenant/Lessee.   The Lease is hereby amended by deleting the name "**Related by BJs, L.L.C.,**" a Georgia limited liability company, the Lessee and replacing it with "**Cleveland's By BJS LLC**", a limited liability company organized under the laws of Nebraska, in all instances where the former name appears in the original lease.

1.1    Counterparts. This First Amendment may be executed in any number of counterparts via facsimile or electronic transmission or otherwise, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

1.2    Entire Agreement. This First Amendment and the Lease sets forth the entire agreement between the parties with respect to the matters set forth herein.  There have been no additional oral or written representations or agreements.

1.3    Authority. The parties signing below on behalf of the parties hereto represent and warrant that they have the authority and power to bind their respective party.

1.4    Terms. Capitalized terms not otherwise defined herein shall have the same meanings as are set forth in the Lease.

1.5    Consents. Landlord hereby represents and warrants to Tenant that all consents required, if any, from lenders, mortgagees, and ground owners, and any other

holders of liens or encumbrances on, against, or affecting the Premises and/or the real property on which the Premises are located, have been obtained for execution and performance of this First Amendment. Landlord agrees to indemnify, defend and hold Tenant harmless from and against any liability, claim, loss, cost, damage or expense arising from or based upon Landlord's failure to obtain all such required consents.

1.6     Conflicts. Except to the extent expressly stated, modified or amended herein, all terms and conditions of the Lease are ratified and confirmed and shall remain in effect as originally written.  The parties agree that in the event of any conflict between the terms of the Lease, as heretofore amended, and this Fifth Amendment, the provisions of this First Amendment shall control.

1.7     Parties Bound. This First Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns.

[Signature Page Follows]

Ex. AA A

**IN WITNESS WHEREOF,** the parties hereto, through their duly authorized representatives, have on the dates set forth below executed this First Amendment to be effective as of the Effective Date.

**LANDLORD:**                                **TENANT:**

**JBL Wisteria Shopping Center, LLC**        **Cleveland's By BJS, LLC**

By: _____               By: _____

Name: _____Jacob Khotoveli_____             Name: **Rodney Johnson**

Title: _____Manager_____            Title: **President**

Date: _____5/24/2022_____            Date: **05/20/2022**


EX. AAA



**WSFS bank**

*We Stand For Service®*

$E\chi.$ $XX$

**COMMITMENT LETTER**

**CONFIDENTIAL**

July 31, 2023

Rodney Johnson
CLEVELAND'S BY BJS, LLC
2337 Highway 78
Snellville, GA 30078

Dear Rodney Johnson:

You have requested that Wilmington Savings Fund Society, FSB ("Bank") provide certain financing to your company. **This letter is delivered to the Borrower on the condition that it be kept confidential and not be shown to, or discussed with, any third party, including any financial institution (other than on a confidential or need-to-know basis with the Borrower's directors, officers, employees, counsel and other advisors, or as required by law) without the Bank's prior approval.** The actual terms and conditions which Bank may extend credit will be subject to complete and definitive written loan documentation acceptable to Bank and its counsel executed by Bank and the undersigned as Borrower. In addition, the credit must be eligible for financing through the U.S. Small Business Administration ("SBA") and contingent upon the approval from the SBA.

**Borrower:**       CLEVELAND'S BY BJS, LLC

**Credit Facility:**       $1,250,000.00 SBA 7(a) Loan

**Purpose:**       Construction leasehold improvements, purchase FF&E, start-up costs and working capital, as further described below:

| Use of Proceeds | 7(a) | Borrower | Total |
|---|---|---|---|
| Construction Contingency | $120,000.00 | | **$120,000.00** |
| Franchise Fee | | $40,000.00 | **$40,000.00** |
| Interest Reserve | $30,000.00 | | **$30,000.00** |
| Leasehold Improvements | $750,000.00 | | **$750,000.00** |
| Purchase FF&E | $200,000.00 | | **$200,000.00** |
| SBA Guaranty Fee | $32,812.50 | | **$32,812.50** |
| Start-up Costs | $30,000.00 | $100,000.00 | **$130,000.00** |
| Working Capital/Closing Costs | $87,187.50 | | **$87,187.50** |
| **Total** | **$1,250,000.00** | **$140,000.00** | **$1,390,000.00** |

**Maturity:**       Twenty (20) years from closing date.

1

{04411406;v1 }





| | |
|---|---|
| **Interest Rates:** | Wall Street Journal Prime Rate plus 2.00%, adjusting quarterly based upon the highest prime rate published in the "Money Rates" section of The Wall Street Journal as of the first day of the month the SBA approves the 7(a) Loan. If the 7(a) Term Loan closed as of the date of this Commitment, the initial interest rate would be 10.25%. |
| **Repayment:** | Six (6) months of interest only payments, followed by two hundred thirty four (234) months of monthly payments of principal and interest payments amortized over thirty four (234) months, with the remaining balance payment of all outstanding principal and interest due at Maturity.  If the 7(a) Term Loan closed as of the date of this Commitment Letter. |

**Voluntary Prepayments:** Borrower may prepay 20% or less of the unpaid principal balance of the Loan at any time without notice.  To prepay more than 20% of the unpaid principal balance, Borrower must give Bank written notice, pay all accrued interest, and if the prepayment is received less than 21 days from the date the bank receives notice, pay an amount equal to 21 days' interest from the date the Bank receives the notice (less any interest accrued during 21 days and paid as required above).  If the Borrower does not prepay within 30 days from the date the Bank receives the notice, borrower must give the Bank a new notice.

In the event any portion of the 7(a) Term Loan is paid in whole or in part in excess of 20% of the outstanding balance in any calendar year prior to the Maturity, so as to constitute a "Prepayment", consideration will be tendered with the Prepayment to the Lender ("Prepayment Consideration") based upon the following schedule:

Five percent (5.0%) of the outstanding loan principal balance prepaid if prepaid within the 1st year of the loan disbursement.

Three percent (3.0%) of the outstanding loan principal balance prepaid if prepaid within the 2nd of the loan disbursement.

One percent (1.0%) of the outstanding loan principal balance prepaid if prepaid within the 3rd year of the loan disbursement.

**Guarantors:** Irrevocable and unconditional guaranty agreement BJ'S FLEET WASH LLC
Irrevocable and unconditional guaranty agreement by Rodney Johnson

**Collateral:** The Credit Facility will be secured by perfected security interests in the following:

(a) First lien on and security interest in all of Borrower's business as assets, present and future and wherever located, including without limitation, accounts, securities entitlements, deposit accounts, instruments, document, chattel paper, inventory, goods, machinery, equipment, furniture, fixtures, commercial tort

2

 

claims, letter of credit rights, general intangibles, payment intangibles, software, licenses, trademarks, tradenames, patents, copyrights and other assets and supporting obligations, and proceeds (and proceed of proceeds, including insurance proceeds) thereof ("Personal Property").

(b) Second lien on and security interest in all of Guarantor's, BJ'S FLEET WASH LLC, business as assets, present and future and wherever located, including without limitation, accounts, securities entitlements, deposit accounts, instruments, document, chattel paper, inventory, goods, machinery, equipment, furniture, fixtures, commercial tort claims, letter of credit rights, general intangibles, payment intangibles, software, licenses, trademarks, tradenames, patents, copyrights and other assets and supporting obligations, and proceeds (and proceed of proceeds, including insurance proceeds) thereof ("Personal Property").

(c) First leasehold mortgage and an assignment of leases and rents on the real property and improvements located at 2337 Highway 78, Snellville, GA 30078 (the "Commercial Property").

(d) Second lien mortgage on real property and improvements owned by Rodney Johnson located at 6716 Northridge Drive, Omaha, NE 68112 (the "Northridge Residential Property").

(e) Second lien mortgage on real property and improvements owned by Rodney Johnson located at 5203 N 53rd Street, Omaha, NE 68104 (the "53rd Street Residential Property").

(f) An assignment of life insurance policy in the amount of $1,250,000.00, insuring the life of Rodney Johnson.

The Credit Facility will be cross-collateralized and cross-defaulted with all other present and future obligations of the Borrower and the Guarantor to the Bank.

**Estimated Fees:**  Loan Packaging Fee - $2,500.00
Search, recording, tax servicing fee, and any other incidental fees related to this transaction.

**Expenses for Credit Facility:**  All expenses incurred by the Bank, (i) in an approximate amount of $10,000.00, including without limitation, appraisal, environmental, searches, construction consultant, recording of UCC filings and other security interests, and audit and any other expenses in reference to structuring, documenting, and closing the Credit Facility and (ii) in an approximate amount of $6,500.00 for reasonable legal fees (inside and outside) plus costs for recordings and filings, and (iii) such other expenses incurred in connection with monitoring or enforcing the Credit

3

{04411406;v1 }





Facility, shall be for the account of the Borrower and payable at closing and otherwise on demand.

**Conditions Precedent
to Credit Facility:**    The Credit Facility is conditioned upon Bank's receipt, review and/or approval of all conditions to closing, including without limitation the following, with all conditions, evidence and documentation to be in form and substance satisfactory to the Bank, in its sole discretion:

(a)    Review and approval by Bank of the terms and conditions of the Credit Facility.

(b)    Receipt by Bank of a duly executed U.S. Small Business Administration Authorization for the Credit Facility (the "SBA Authorization"), together with satisfactory review and acceptance by the SBA of all documentation required by the SBA, including without limitation the SBA Form 1919 and IRS Form 4506-C.

(c)    A copy of the Ground Lease for the property located 2337 Highway 78, Snellville, GA 30078 between Ground Lessor and CLEVELAND'S BY BJS, LLC, as Lessee ("Leased Property"). The lease shall have a minimum term of Twenty (20) years, including options to renew. Ground Lease to be fully subordinate to this loan.

(d)    A Ground Lessor's Consent from Ground Lessor, as Lessor to the Bank at closing.

(e)    Tri-party agreement required between Landlord, Tenant, and Lender.

(f)    An ALTA 2006 Lender's Title Insurance policy insuring the Leasehold Interest of the mortgage on the Commercial Property in the amount of $1,250,000.00 as a first lien on the Commercial Property, subject only to such exceptions as are acceptable to the Bank, with endorsements as Bank may designate.

(g)    ALTA/NSPS Survey, as necessary to remove the survey exception from the ALTA 2006 Lender's Title Insurance Policy.

(h)    An appraisal of the Commercial Property, prepared by an MAI appraiser engaged by the Bank, which shall state a fair market value in an amount acceptable to the Bank and which shall otherwise be in form and substance to the Bank. The appraisal shall indicate the "as-is" and "as-completed" value of the property, at a value the Bank finds acceptable.

(i)    Environmental Assessment of the Commercial Property pledged as collateral for the Credit Facility, stating that the property is free of environmental problems, in such form as the Bank may require, including but not limited to a record search, transaction screen analysis, Phase I and/or Phase II.

(j)    Property search on Northridge Residential Property and 53rd Street Residential Property showing prior liens.

4

{04411406;v1 }



**WSFS bank**

*We Stand For Service®*

$Ex. XX$

(a)　　With respect to Borrower, (i) a copy of any bylaws, trust agreement, partnership or operating agreement, if any; (ii) a copy of the certificate of formation or articles of incorporation, as applicable, filed with the Secretary of State of the jurisdiction in which such entity was formed; and (iii) verification of good standing with respect to such entity in the jurisdiction in which such entity was formed.

(b)　　All permits and licenses to operate the business.

(c)　　A certificate, to be dated as of the Closing Date as to the incumbency of officers, partners, or members, as appropriate, of the Borrower and each corporate Guarantor.

(d)　　Resolutions of the Borrower evidencing approval of the Credit Facility and all steps necessary to consummate the Credit Facility including, without limitation, execution of the Loan Documents.

(e)　　Borrower's and each Guarantor's Tax Identification Number, W-9 and/or SS-4.

(f)　　Lien searches, including without limitation, UCC, tax lien, judgement, litigation and bankruptcy searches on each Borrower and Guarantors, as applicable.　All costs associated with such searches will be the responsibility of the Borrower.

(g)　　If any location where Collateral is located, including without limitation, the Commercial Property, Northridge Residential Property and 53rd Street Residential Property is located in an area designated as a flood hazard area by any governmental agency, the Borrower will provide the Bank, at the Borrower's expense, with a policy of flood insurance in an amount equal to the maximum amount available under the federal flood insurance program, or such higher amount as the Bank may require.

(h)　　Evidence of legally binding insurance covering such risks as are required by the Bank, including without limitation, hazard, personal property, general liability, and workers compensation, the Bank as mortgagee, lender loss payee, additional insured or certificate holder, as appropriate.

(i)　　A copy of the Life Insurance Policy issued on the life of Rodney Johnson in an aggregate face amount equal to $1,250,000.00 which policy shall be collaterally assigned to the Bank pursuant to a duly executed Collateral Assignment of Life Insurance Policy, identifying Wilmington Savings Fund Society as "assignee", and acknowledged by the home office of the issuer of such life insurance policy.

(j)　　Executed Franchise Agreement for Scooter's Coffee franchise, and approval by SBA and Bank of all executed franchise documents.

(k)　　Delivery of evidence of equity injection in the amount of $140,000.00 with satisfactory documentation of the source and use of funds, including three month bank statements, paid invoices, cancelled checks, wire statements and gift affidavits, as applicable.

5

{04411406;v1 }

**WSFS bank**

*We Stand For Service®*

Ex. XX

(l)      Duly executed copies of the Borrower's and Guarantor's federal income tax returns from the three (3) years immediately preceding the date hereof, which tax returns shall be true and correct copies of the tax returns filed by the Borrower and Guarantor, as applicable with the Internal Revenue Service. If recent tax return on extension, then a copy of W-2s will be required

(m)     All documentation necessary to comply with the United States Patriot Act, including two forms of acceptable identification.

(n)      Legal opinions, as required by the Bank, relating to the Borrower, the Guarantor and the Credit Facility.

(o)      Evidence that all of the terms and conditions contained in the SBA Authorization have been satisfied.

(p)      Evidence that all actions necessary or, in the opinion of the Bank, desirable, to perfect and protect the security interest of the Bank have been taken.

(q)      No material adverse change in the condition, financial or otherwise, operations, properties, assets or prospects of the Borrower or any Guarantor.

(r)      No material threatened or pending litigation or material contingent obligations.

(s)      Any and all other conditions required by the Bank to comply with the SBA regulations, which conditions shall take precedence over this commitment.

(t)      Receipt, review and acceptance of account statements evidencing available marketable securities.

(u)      Receipt, review and acceptance of site visit conducted by the Bank or Bank-approved third party site inspector.

(v)      A copy of all invoices, bids or proposals for the construction.

(w)     SBA form 601 signed by any contractor performing work of more than $10,000.

(x)      W-9 form for all contractor payees with proper Tax ID information

(y)      A copy of permits which have been issued.  Please be aware that the process of obtaining permits could be lengthy and sometimes delay closing. Please be sure to begin the process of filing for your permits as soon as possible.

(z)      Evidence of Builder's Risk Insurance in an amount and in a form acceptable to Lender in its reasonable discretion.

6

{04411406;v1 }





**WSFS** bank

We Stand For Service®

     (aa)    Proof that all contractors have Worker's Compensation and General Liability Insurance in an amount sufficient to satisfy state statutory requirements

     (bb)    A copy of a firm "stipulated sum" or "not to exceed" construction contract. This must include a line item budget, detailing costs for all aspects of construction, and any supporting documents, such as price sheets or purchase agreements for machinery and equipment.

     (cc)    Certificate of Occupancy.

     (dd)    Lien Waivers, Removal of Mechanics Lien Language and verification of 100% completion of improvements.

     (ee)    Borrower's agreement to provide Bank with any tenant improvement funds it receives post-closing to pay down the Credit Facility.

| | | |
|---|---|---|
| **Reporting Covenants:** | | |
| | (a) | Annual tax returns and financial statements of the Borrower within 120 days of fiscal year end. |
| | (b) | Annual tax returns and personal financial statements for individual Guarantors within 120 days of fiscal year end, or in case of an extension, within 30 days of filing. |
| **Covenants:** | | Affirmative and negative covenants will be specified by the Bank for inclusion in the Loan Documents. |
| **Bank Account:** | | The Borrower will establish and maintain with the Bank a deposit account for the term of the Credit Facility from which all payments due Bank shall automatically be debited when due. |
| **Documentation:** | | Loan Documents in form and substance satisfactory to the Bank must be executed and delivered containing representations, warranties, covenants, indemnities, conditions to lending, events of default and other provisions as are appropriate in the Bank's opinion and specified by the Bank. |
| **Governing Law:** | | Law governing where collateral is located. |
| **Miscellaneous:** | | Waiver of Jury Trial. |

7

{04411406;v1 }





**Authorization to Pre-File:** This letter, when signed by Borrower below, will constitute Borrower's authorization to the Lender to pre-file UCC financing statements against Borrower covering all of Borrower's present and future personal property, assets and fixtures in such offices as deemed necessary by Lender. The Lender agrees to terminate these filings promptly should the proposed loan(s) not fund for any reason. The Borrower and Lender agree that an electronic copy of this signed letter may be relied upon by Lender as an original.

If the offer evidenced by this letter is acceptable, please indicate your acceptance by signing and returning the enclosed copy of this letter to the Bank by August 11, 2023 along with a check in the amount of $2,500.00 representing payment of the non-refundable packaging fee and good faith deposit towards closing costs. Any good faith deposits collected by Lender are non-refundable to the extent that the Bank incurred any out of pocket expenses whether or not a closing occurs. Any unpaid cost of third party reports will be due prior to ordering of those reports by bank.

The Borrower acknowledges that the Bank may obtain, and by signing below the Borrower and any individual guarantor provide written authorization to the Bank, in its sole discretion, to obtain customer, vendor and credit reference checks as well as tax liens, litigation and judgment searches, and background reports on the Borrower and certain key individuals associated with the Borrower (including without limitation personal credit profiles for one or more national credit bureaus). This authorization extends to obtaining a credit profile in considering this Credit Facility.

Thank you for giving Wilmington Savings Fund Society the opportunity to provide you with this financing package. If you have any questions on the above, please contact the undersigned at Wilmington Savings Fund Society at 484.880.0447 (office), 484.880.0447 (cell phone) or by email at CBuchholz@wsfsbank.com.

Sincerely,
Carl Buchholz
VP, SBA Relationship Manager

8

{04411406;v1 }





THE UNDERSIGNED, INTENDING TO BE LEGALLY BOUND, AGREES TO THE EXPENSE REIMBURSEMENT PROVISIONS, AUTHORIZES THE BANK TO OBTAIN CREDIT REPORTS, AND AGREES TO KEEP THE TERMS OF THIS LETTER CONFIDENTIAL AND NOT SHOW IT TO, OR DISCUSS IT WITH, ANY THIRD PARTY.

Accepted by:

BORROWER:

CLEVELAND'S BY BJS, LLC

By: _____

Rodney Johnson, Sole Member

Date: 08/01/2023 _____

GUARANTOR:

BJ'S FLEET WASH LLC

By: _____

Name:

Title

_____

Rodney Johnson, Individually

Date: 08/01/2023 _____

9

{04411406;v1 }

**From:** Lisa White lisa.white@scooterscoffee.com
**Subject:** RE: METER INVOICE I EPN2022-01300 SCOOTER'S COFFEE
**Date:** August 1, 2023 at 10:17 AM
   **To:** Rodney Johnson r.johnson@bjsfleetwash.com, Casey Gray casey.gray@scooterscoffee.com, Dan Forslund
   Dan.Forslund@scooterscoffee.com, Steve Jenkins steve.jenkins@scooterscoffee.com

Thanks Rodney, I will pass this along to the civil engineer so they can submit your receipt and final civil drawings to the City of Snellville.



**LISA WHITE**
Senior Manager, Pre-Development, West
O: (531) 710-5176
11808 Miracle Hills Dr, Suite 400 | Omaha, NE 68154

**BE AMAZING!**



scooterscoffee.com

# EX. UU

IMPORTANT NOTICE: This e mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients and vendors of Boundless Enterprises, Scooter's Coffee and/or Harvest Roasting may contain information that is confidential and legally privileged. Please do not read, copy, forward, or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it to the sender and delete it completely from your computer system.

**From:** Rodney Johnson <r.johnson@bjsfleetwash.com>
**Sent:** Tuesday, August 1, 2023 10:09 AM
**To:** Lisa White <lisa.white@scooterscoffee.com>; Casey Gray <casey.gray@scooterscoffee.com>; Dan Forslund <Dan.Forslund@scooterscoffee.com>; Steve Jenkins <steve.jenkins@scooterscoffee.com>
**Subject:** Fwd: METER INVOICE I EPN2022-01300 SCOOTER'S COFFEE

Bjs Fleet Wash
402-319-3390
www.bjmobilewash.com

Begin forwarded message:

> **From:** DWR New Permits <DWRNewPermits@gwinnettcounty.com>
> **Date:** August 1, 2023 at 9:57:20 AM CDT
> **To:** Rodney Johnson <r.johnson@bjsfleetwash.com>, DWR New Permits <DWRNewPermits@gwinnettcounty.com>
> **Cc:** "Dobson, Shawna" <Shawna.Dobson@gwinnettcounty.com>, "Thomas-Hawkins, Sandra" <Sandra.Hawkins@gwinnettcounty.com>, "Reese, Jason" <Jason.Reese@gwinnettcounty.com>, "Moss, Timothy" <Timothy.Moss@gwinnettcounty.com>, "Carlisle, Victoria" <Victoria.Carlisle@gwinnettcounty.com>
> **Subject: RE: METER INVOICE I EPN2022-01300 SCOOTER'S COFFEE**
>
>
> Good Morning,
>
> This has been paid.
>
>
> *** PLEASE DO NOT REPLY ***
>
>
> ```
>      G W I N N E T T   C O U N T Y
> Acct #: 000020993684  TN/RN:  19/03529925
> 8/1/2023 10:47 AM  Main DWRCNDSK PEDORCEL
> Receipt Amount:              $17,930.00
> Transaction Amount:          $17,930.00
> CLEVELANDS BY BJS LLC
> 2337      EAST MAIN ST
> SNELLVILLE
> Utility Bill Payment         $17,930.00
>
> Transaction Total:           $17,930.00
> Check        1054            $17,930.00
> ```

EX. ᴜᴜ

Checks presented:

**CLEVELAND'S BY BJS, LLC**
6716 NORTHRIDGE DR
OMAHA, NE 68112-2644

1054

DATE 8-1-2023    39-64/1030



PAY TO THE ORDER OF ___Gwinnett county water___    | $ 17,930 ⁰⁰/₁₀₀

Seventen thousand nine hundred and thirty - DOLLARS 🔒 Security Features Included. Details on Back

**CHASE** 🔵
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO _____    _____    MP

8/1/2023 10:47 AM
THANK YOU



Gwinnett
vibrantly connected

Royce Bunn | Customer Care Associate Water Meter Division
Department of Water Resources | Gwinnett County Government
678.376.6887| 684 Winder Highway Lawrenceville, GA 30045
www.gwinnettcounty.com | DwrCare@gwinnettcounty.com
Learn more about Gwinnett County Water Resources at www.gwinnettH2O.com

NOTE: Email is provided to employees for the administrative needs of the county. Email correspondence to/from a county email account is considered public information and subject to release under Georgia laws or pursuant to subpoena.

**From:** Rodney Johnson <r.johnson@bjsfleetwash.com>
**Sent:** Thursday, July 27, 2023 12:43 PM
**To:** DWR New Permits <DWRNewPermits@gwinnettcounty.com>
**Cc:** Dobson, Shawna <Shawna.Dobson@gwinnettcounty.com>; Thomas-Hawkins, Sandra <Sandra.Hawkins@gwinnettcounty.com>; Reese, Jason <Jason.Reese@gwinnettcounty.com>; Moss, Timothy <Timothy.Moss@gwinnettcounty.com>; Carlisle, Victoria <Victoria.Carlisle@gwinnettcounty.com>
**Subject:** Re: METER INVOICE I EPN2022-01300 SCOOTER'S COFFEE

I am going to send a check today thank you so very much for all the help

Bjs Fleet Wash
402-319-3390
www.bjmobilewash.com

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Rodney Johnson

**DEFENDANTS** Ryan Wizsen, Benard in den Bosch Jeffery Bloom, Karen Taylor, Hanna Adzponu Laura Marlanc

**(b)** County of Residence of First Listed Plaintiff   **Douglas**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   **Douglas**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pro Se Rodney Johnson 6716 Northridge dr Omaha, NE 68112 402-210-3052

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer |
| | | | | | ☐ 8 Multidistrict Litigation - Direct File |

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
USC 42 1983
Brief description of cause:
Johnson was retaliated against for first amendment activities which included but was not limited to Public records request, bid protest and litigation

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.   DEMAND $         CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____